Complaint for a Civil Case

# UNITED STATES DISTRICT COURT
for the

District of Utah

Central Division

FILED
U.S. DISTRICT COURT
2019 JUN -7 P 12: 34
DISTRICT OF UTAH
BY: _____
DEPUTY CLERK

TRAVIS CRACRAFT

-v-

UTAH VALLEY UNIVERSITY, a public university
and
JARED LESSER dba JL HOME DESIGN

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case: 2:19-cv-00397
Assigned To : Campbell, Tena
Assign. Date : 6/7/2019
Description: Cracraft v. Utah Valley University, et al

Jury Trial: *(check one)*  ☒ Yes   ☐ No

COMPLAINT
FOR A CIVIL CASE

## COMPLAINT FOR A CIVIL CASE

This lawsuit is based on the previous lawsuit numbered 2:19-CV-00124 which was filed on February 22, 2019 and dismissed without prejudice on May 30, 2019.

I.  **The Parties to This Complaint**

   A.  **The Plaintiff**

   | | |
   |---|---|
   | Name | Travis Cracraft |
   | Street Address | 3653 S. Redmaple Rd. |
   | City and County | Millcreek, Salt Lake County |
   | State and Zip Code | Utah 84106 |
   | Telephone Number | (801) 885-8998 |
   | E-mail Address | tjcracraft@gmail.com |

   B.  **The Defendants**

    Defendant No. 1
        Name: Utah Valley University
        State and Zip Code: Utah 84058

    Defendant No. 2
        Name: Jared Lesser
        State and Zip Code: Utah 84003

## II. The Basis for Jurisdiction Is a Federal Question

The Federal Question is based on the following codes:

18 USC §1964 (c) – Civil remedies
18 USC §1962 – Prohibited activities

## III. Statement of Claim

1. As a Computer Science major at Utah Valley State College (UVSC), now Utah Valley University (UVU), I took a course titled "Advanced Topics in Data Communication" during the Spring 2003 semester. As part of my work for that class I gave a description of an algorithm as an answer to a quiz question.

2. The instructor of the course, Dave Heldenbrand, later listed some deficiancies of the algorithm, of which I was aware when I designed it, and at least one is stated in the patent. He indicated that while novel, the algorithm had no value because of its shortcomings, and that it was effectively a "technological party trick."

3. UVU did have a system for inquiry notice. It was described by Dave Heldenbrand who spent more time speaking about when not to use it than how it worked. He used the same "valuable, not just novel" language to describe when the inquiry system should and shouldn't be used that he'd used to describe the algorithm of Claim #1. This included an assignment about not using the inquiry notice system, and for which I used the term "technological party trick."

4. An algorithm that functions nearly identically to the algorithm from Claim #1 was patented in South Korea a few months later.

5. The algorithm of Claim #4 is derived from the algorithm of Claim #1, not developed in parallel.

6. I made a habit of criticizing UVU in the written portions of my coursework. In the semester project for "Interpersonal Relations," I wrote that my instructors were complaining about how UVU was forcing off-topic coursework to meet the requirements for accreditation by ABET, the Accreditation Board for Engineering and Technology. I also wrote that with these corners cut, the intentions of the requirements were being undermined by the instructors, who weren't really qualified to teach or grade the work to ABET's standards.

7. I was later told that ABET requires that it is given samples of the work that students submit based on where they fall in relation to the class (a certain percentage from the top of the class, a certain percentage from the bottom, etc.) I was also told that my grade had been raised to keep it out of the papers that ABET would receive, and that as a degree seeking student, it wasn't in my best interest to hinder the accreditation process. The paper was supposed to be based on a semester long project involving an individual with which I could improve our relationship using techniques learned in the class. It would also account for the majority of the grade for the entire course. I'd written less than three double-spaced pages about my relationship with UVU, during which I referenced one ten-minute or so interaction with my academic adviser and a conversation with a peer who mocked the course. I received an A-.

8. In 2006, my "employer," Jared Lesser doing business as JL Home Design, which was doing business as Custom Home Plans Inc. (a corporation with an EIN), had me sign something that said that intellectual property I'd created would belong to him/his company. I argued that he should only own intellectual property created within the scope of my employment, which was drawing house plans, and he said that's what it meant. He also said that it needed to be back-dated to "anytime in 2002," even though I started working there in 2004.

9. Shortly thereafter, UVU gave a survey about employment. It asked where I worked, if my employer would own any intellectual property I developed, and if so, what. I filled it out and wrote, "Drawings Only" for what intellectual property my employer would own. Another survey, given shortly afterward, only had check boxes for "Yes" or "No."

10. In 2007, Mr. Lesser purchased the building in which his office was located that also contained other rental units. He also purchased at least one house for use as a rental property. He claimed to have bought them

Complaint for a Civil Case

without the need for a loan.

11. US patent 7437054 was granted in 2008 for the algorithm in Claim #4.

12. During the Spring 2006 semester, on my way into the classroom for the course ENGL 2020 - "Intermediate Technical Writing for Scientists and Engineers," I was stopped by a campus police officer who used a metal detecting wand on me and asked me to take off my shoes so he could inspect them. Many of the other students were also stopped and wanded but weren't asked to remove their shoes.

13. Immediately following the events of the previous claim, the instructor of the course, Ms. Drott, said that the English department required that all students relinquish the intellectual property rights to the work they submit. Then she passed copies of a document to each of the students saying that it was "impossible to pass the class" without signing the document. This happened during the first lecture after the deadline to transfer or drop classes.

14. In subsequent online versions of the course, during the first session after the drop/transfer deadline, a window would appear informing me that if I were to continue, everything that I submitted would be the property of the school. The only available option was to click "OK."

15. During the Spring 2011 semester, when I again took ENGL 2020 in a traditional classroom, the class was again told that it was the policy of the English department that students who didn't sign away the rights to their intellectual property wouldn't be able to pass the class. This was again during the first lecture after the drop/transfer deadline. This time however, the class was asked to leave all of their belongings except for paper and a pen or pencil, including their shoes, on the opposite end of the classroom. The instructor also commented that the pen of one of the students was "too fat" and asked them to get another one.

16. ENGL 2020 is a required course for most, if not all, undergraduate students seeking degrees in the fields of science or engineering, including me.

17. That because ENGL 2020 is required for many degrees, preventing students who don't sign away their intellectual property rights from passing the class would also prevent them graduating. Additionally, telling them they may not be able to graduate would hold the investment they've already made in their education

hostage. For these reasons the previous five claims constitute a pattern of intellectual property theft by extortion that may have affected thousands of students over its six-year practice. Even if it weren't true that the policy was department-wide, and the extortionate window during the Internet courses only appeared on my screen, it still affected and was witnessed by dozens of students other than myself in the spring semesters of 2006 and 2011.

18. Nearing graduation, I received an email that originated from a legal.uvu.edu email server instructing me to appear at a mandatory meeting at UVU on the evening of March 9, 2012. The email also instructed me not to bring anybody with me.

19. Upon arriving at the meeting from the previous claim, I met with a man who introduced himself as Dan (formally, Daniel F.) Van Woerkom. He told me he'd been asked to be there by multiple people at the Utah State Attorney General's Office and that the Attorney General's Office represented the UVU.

20. At that meeting, Mr. Van Woerkom told me that UVU wouldn't graduate students who believed that the school had done anything illegal. I was led to believe that if I didn't sign something I couldn't read in that dimly lit room, right then, that I wouldn't be able to graduate.

21. The events of the previous claim constitute extortion by Mr. Van Woerkom.

22. The email and meeting as described in Claims #18-20 were unique to me. No other graduating student I spoke with was required to attend such a meeting.

23. Mr. Van Woerkom has also done legal work for Mr. Lesser on multiple occasions, including defending him against allegations of intellectual property theft.

24. On or about April 6, 2016, I sent an email to Kris Pace, a paralegal with UVU's Office of General Counsel. In that email, I gave a brief description of the mandatory meeting during which I was extorted. The April 7, 2016 response states that "no UVU attorneys met with anyone as you describe. We are unaware of any document that you signed as you describe in your account."

25. Another email from Kris Pace on April 25, 2016 states "Daniel Van Woerkom has never worked for the Attorney General's Office or for UVU, nor has he had any connection with UVU - especially not as a legal

representative or handling any legal matters for UVU."

26. UVU and/or the Utah State Attorney General's Office must have intentionally given Mr. Van Woerkom, who didn't work for or with UVU or the Attorney General, an email account attached to the legal.uvu.edu domain name for the purpose of committing wire fraud to lure me to a meeting where he would use the color of authority loaned to him by his email address, and his claim that he was asked to be there by people who do represent UVU and from whom he was given that address, to extort a signature from me. These acts not only demonstrate knowledge of guilt, but that even "9 years after the algorithm was described" they were still endeavoring to hide it from me.

27. On September 28, 2016, I recorded a conversation with Mr. Lesser during which he confirms that he should've only owned the intellectual property rights to house plans that I'd drawn for him.

28. The sum of these claims indicates that UVU intentionally profited from intellectual property I'd created without providing me with any compensation or credit by deceiving me about its value, my intellectual property rights, and the mechanisms to protect those rights. The credit would have had substantial value because having my name on a patent would have been of significantly greater value to my reputation and career than having an undergraduate degree from a school of which most people haven't heard. Years after the creation of the intellectual property, in an effort to retroactively and fraudulently "legitimize" their theft, they conspired with Mr. Lesser so they could pretend they'd acquired it from him.

## TIMELINESS

Because some of the claims in this lawsuit are from a previous lawsuit, to the extent that Utah Code 63G-7-403 applies, it is timely by UC 63G-7-403(3)(b). Additionally, statute of limitations arguments have been made, so I will attempt to save some time by defending myself against them.

UVU argued that I should've discovered that my algorithm was patented in 2003, but it is unreasonable to expect me to detect that it had been patented on the other side of the planet, in Korean, a language that uses a non-roman alphabet.

UVU's argument doesn't get any more reasonable three years later, in 2006, because I thought that the contract

given to me to sign by my boss, for whom I did knowingly develop intellectual property, contained wording that was too broad.  Besides this argument being illogical, he verbally clarified that his ownership would be limited to the IP created within the scope of my job.  He confirmed this during the recording of Claim #27.

UVU argued that in 2008 I should have discovered that one two-sentence answer to one question on one quiz that I'd taken five years earlier had been patented.  At least they're local and in English now.  However, because the nature of Computer Science is to create algorithms, it is unreasonable to expect a Computer Science major to check that all coursework that specifically asks for an algorithm to be designed, or that could be completed by designing an algorithm, be checked going back five years.  Additionally, Computer Science students who are learning to create algorithms rely heavily on the feedback their professors give them about the algorithms they design.  It is one thing for a professor to state an incorrect opinion about the value of an algorithm; it is another for the professors to explicitly devalue one, then sell it behind the student's back.

UVU's argument that I should have known in 2012, during the meeting of Claims #19 and #20, doesn't work either.  It wasn't until I was writing this document that I realized that the reason for the extortion in Claims #13-15 was most likely to create some kind of throw-away injuries that I wouldn't complain about to get a degree.  They would know that I would know that the research papers that I would write for the English course on junior-high-school-level topics like climate change, to which they had brazenly stolen the rights, wouldn't have enough monetary value for me to go to the effort to fight about when it came time for me to graduate.  This would effectively obscure their true intention of getting away with having stolen IP with significantly more value, which they did much more low-key.  I had previously believed that the reason UVU was extorting the IP rights to English papers I'd write might be to be able to control the distribution of any UVU-is-defrauding-its-way-into-accreditation papers I might write, similar to the paper of Claims #6 and #7.

Even if I had been aware of the Korean patent, a reasonable person would assume that the algorithm that I'd described well enough in two sentences that a competent professional could create it was developed in parallel on the other side of the planet, not stolen and taken there.

Until I received Kris Pace's April 7, 2016 response from Claim #24, it was reasonable for me to believe that Mr.

Van Woerkom, who claimed to be at the meeting at UVU because he was asked by the people who represent UVU, and from whom I'd received an email through legal.uvu.edu, really was acting on behalf of UVU. Because the patents weren't, to the best of my knowledge, in the names of UVU or any of UVU's employees, it wasn't until I was told that the meeting didn't have anything to do with UVU, that I would know that I had any reason to look outside of UVU. For this reason, accrual of time for the purpose calculating the statute of limitations couldn't have begun before April 7, 2016, which is less than four years ago. That said, it wasn't until much later that I'd discover what had actually happened, so this lawsuit is not barred by the statute of limitations because of the injury-discovery rule.

After that email, Mr. Van Woerkom led to Mr. Lesser, who wanted me to date the IP rights document "anytime in 2002." That would include December 31, 2002, which led to Spring 2003, which led to "Advanced Topics in Data Communication" and the algorithm from Claim #1.

## IV.     Relief

Relief is sought in the amount of $300,000,000 which includes $100,000,000 in consequential damages for unjust enrichment, 16 years of compounded interest, ongoing loss of opportunity and damage to my credibility and career in computer science.

This figure also includes $200,000,000 in punitive damages which are deserved because the especially egregious nature of the defendant's actions can be characterized by the scope of the conspiracy, the authority and trusted nature of the involved parties, its duration of several years, its difficulty to detect, and its maliciousness.

However, because I haven't read some of the documents I was forced to sign, and because I created numerous instances of intellectual property during my 12 years at UVU, I reserve the right to include additional currently unspecified amounts and conditions for as yet unknown or unspecified claims until after discovery.

## V.      Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause

unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 06/07/2019

Signature of Plaintiff   *[signature]*

Printed Name of Plaintiff   Travis Cracraft